WESTERN RESERVE MUTUAL CASUALTY COMPANY, Appellant,

v.

EBERHART et al., Appellees.

[Cite as *W. Reserve Mut. Cas. Co. v. Eberhart* (1991), 81 Ohio App.3d 93.]

Court of Appeals of Ohio,
Summit County.

No. 14986.

Decided Aug. 7, 1991.

*Matthew J. Koch* and *David E. Fish,* for appellant.

*David P. Bertsch,* for appellees.

REECE, Judge.

Plaintiff-appellant, Western Reserve Mutual Casualty Company ("Western Reserve"), challenges the findings of the Summit County Court of Common Pleas in this declaratory judgment action. The court concluded that defendant-appellee, Dianne M. Eberhart, was entitled to proceeds of a homeowners insurance contract issued to Donald and Daisy Gengler. The couple's adult

son, Patrick Gengler, was covered by the policy and had previously dated Eberhart. On the evening of June 12, 1987, he shot Eberhart and then committed suicide.

This matter was tried to a referee who recommended judgment in favor of Eberhart. The trial court adopted the referee's conclusions and this appeal follows.

## Assignment of Error No. I

"The trial court's finding of no evidence of an intentional act by Patrick Gengler is erroneous."

█ The sole basis advanced by Western Reserve for denying coverage is the policy's express exclusion for bodily injuries "expected or intended" by the insured.[1] The Supreme Court of Ohio recently held that:

"In order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended." *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, syllabus.

The judgment of the trial court will not be overturned if supported by competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

█ The insurance policy in question does not specifically define "expected or intended" injuries. Under the common law, conduct is intentional if (1) the actor desires to cause the consequences of his act or (2) the actor believes the consequences are substantially certain to result but proceeds anyway. Restatement of the Law 2d, Torts (1965) 15, Section 8A; see *Lyons v. Babcock & Wilcox* (Apr. 3, 1991), Summit App. No. 14863, unreported, at 3, 1991 WL 47596. We find, as did the trial court, that this definition fairly reflects the meaning typically afforded such exclusionary provisions. See *Nationwide Mut. Fire Ins. Co. v. Turner* (1986), 29 Ohio App.3d 73, 75, 29 OBR 83, 85, 503 N.E.2d 212, 214. The Supreme Court, furthermore, explained in *Physicians Ins. Co., supra*, 58 Ohio St.3d at 193, 569 N.E.2d at 911, that:

---

1. The agreement states, in pertinent part:
   "This policy does not apply:
   "1. Under Coverage E—Personal Liability and Coverage F—Medical Payments to others:
   " * * *
   "f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured."
   Such provisions are extremely common and consistent with the fundamental principle that an individual should not be insured against the pecuniary consequences of his intentional wrongdoings. See *Figueroa v. Hartford Ins. Co.* (1990), 241 N.J.Super. 578, 582–583, 575 A.2d 888, 891.

" * * * [I]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional. * * * "

At the evidentiary hearing before the referee, Eberhart testified that Patrick Gengler became obsessed with her after they ceased dating. He would follow her to work and call her on the phone several times a day. He confronted her and her new boyfriend, Mark Ihasz, one night and attacked them with a golf club. Gengler was consequently arrested and charged with assault.

On June 12, 1987, Gengler approached Eberhart at Ihasz's home in Akron. He demanded that they drop the charges against him and they refused. In response, Gengler threatened to kill them.

Donald Gengler's sworn deposition testimony was admitted at the hearing. He stated that later that same evening, his son asked him and his wife to give Patrick a gun so he could kill himself and Eberhart. When the parents tried to reason with him, Patrick left and went to his brother's home. Under the ruse of a morning "hunting trip", he was able to convince his fifteen-year-old nephew to lend him a shotgun.

Eberhart explained that Patrick Gengler returned to Ihasz's house about midnight. She and Ihasz saw the gun and fled into the residence. When Eberhart thought Gengler had broken through a back door, she ran out the front and eventually into the yard of another home. Gengler caught up with her and she grabbed the gun barrel. As they briefly wrestled, Eberhart begged him not to do anything but Gengler repeatedly told her to "say goodbye." Eberhart's foot slipped and she released the weapon. She continued to plead with him to no avail. She heard Gengler again tell her to "say goodbye" and then felt the shot hit her body.

The trial court found that Western Reserve had failed to satisfactorily establish that Gengler shot Eberhart with the intention of harming her and opined that the gun could have discharged accidentally. At no time did Eberhart suggest that the shooting was unintentional and no evidence was offered to support this hypothesis. The uncontested testimony available in the record confirms that on the night of the attack Gengler (1) told Eberhart as well as his parents and Ihasz that he was going to kill Eberhart, (2) went to great lengths to procure a shotgun, (3) broke into Ihasz's home and chased Eberhart outside, (4) ignored her pleas for mercy while repeatedly telling her to "say goodbye," and (5) fired the gun at point-blank range severely injuring her, (6) after their struggle had ceased.

■ In the standard civil lawsuit, such as that presented here, the trier of fact deals only with probabilities and the burden of proof is carried by a simple preponderance of the evidence. *Cincinnati, Hamilton & Dayton Ry. Co. v. Frye* (1909), 80 Ohio St. 289, 88 N.E. 642, paragraph two of the syllabus. The trier need not conclusively believe a fact exists so long as the probabilities, when weighed, preponderate in favor of such. *Davis v. Guarnieri* (1887), 45 Ohio St. 470, 490, 15 N.E. 350, 360. See 44 Ohio Jurisprudence 3d (1983) 433–440, Evidence and Witnesses, Sections 1027–1029.

In the instant case, the evidence preponderates heavily in favor of a conclusion that Gengler stalked, terrorized, and shot Eberhart with the intention of causing severe bodily injury, if not death. By requiring Western Reserve to further discredit the unsubstantiated possibility of an accidental shooting, the trial court imposed an evidentiary burden approaching the reasonable doubt standard reserved for criminal trials. See *Jones, Stranathan & Co. v. Greaves* (1874), 26 Ohio St. 2. Since all the facts presented indicate that the attack was intentional and no reliable, credible evidence suggests anything to the contrary, the trial court should have found that Western Reserve had satisfactorily established the applicability of the policy exclusion.

This assignment of error is sustained.

### Assignment of Error No. II

"The trial court erred in holding that an individual suffering from a mental illness as defined by Ohio Revised Code Section 5122.01(A) cannot commit an act within the meaning of an intentional injury exclusion clause."

■ The trial court also found, however, that Patrick Gengler was mentally ill and incapable, in any event, of intentionally inflicting Eberhart's injuries. It is firmly established that a person is presumed sane unless otherwise shown. *Kennedy v. Walcutt* (1928), 118 Ohio St. 442, 453, 161 N.E. 336, 339; see, also, 42 Ohio Jurisprudence 3d (1983) 404–405, Evidence and Witnesses, Section 147. We therefore agree with the court in *Midwestern Indemn. Co. v. Manthey* (1990), 68 Ohio App.3d 539, 541, 589 N.E.2d 95, 97, that " * * * the party arguing that an insured was insane (therefore rendering an intentional injury exclusion clause inapplicable) has the burden of proving, by a preponderance of the evidence, such insanity."

The trial court specifically found, and Eberhart does not dispute, that Gengler was *not* legally insane at the time of the attack. However, the following exchange took place during direct examination of Eberhart's expert witness, Robert Wettstein, M.D.:

"Q. Doctor, do you have an opinion as to whether or not Mr. Gengler knew what he was doing that evening?

"A. Yes.

"Q. What is your opinion?

"A. He knew he was trying to kill Dianne.

"Q. And do you have an opinion as to whether or not Mr. Gengler knew whether or not—or knew the difference between right and wrong at the time he shot Miss Gengler [*sic*]?

"A. No, I don't.

" * * *

"Q. Do you have an opinion—if, in fact, as you have testified that Mr. Gengler did know what he was doing that night, do you have an opinion based upon a reasonable degree of psychiatric, psychological certainty as to whether he was acting under any type of compulsion that he could not control?

"A. Yes, he was. That's the—that's the result of the depression and of the delusional jealousy, consistent with following her around, telephoning her, spying on her, same sort of behavior."

Kimberly K. Cook, who had previously counseled Gengler, similarly felt he was unable to control his impulses and "needed a cooling off period."

The trial court's judgment relies heavily upon a statutory definition of "mental illness." R.C. 5122.01(A) states:

" 'Mental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

The trial court held that a non-insane individual who was nevertheless "mentally ill" was still incapable of inflicting an intentional injury.

■ By the express declaration of R.C. 5122.01, the definition employed by the trial court is limited to R.C. Chapter 5119 which regulates the Ohio Department of Mental Health. The application of this provision to an insurance contract is, as far as we are aware, unprecedented. The term "mental illness," in this context, is broad and sweeping with no readily discernable limitations. It is difficult to imagine how an individual who brutally and unjustifiably assaults another would *not* be suffering from a "substantial disorder" of "thought" or "mood" which "grossly impairs" his judgment.

■ This court recognized some time ago that insurance contracts "must be given a fair and reasonable interpretation to cover the risks anticipated by the parties." *Snyder v. Motorists Mut. Ins. Co.* (1965), 2 Ohio App.2d 19, 21, 31

O.O.2d 65, 66, 206 N.E.2d 227, 228. We are convinced that it is manifestly unreasonable to assume that either party to the policy in question expected the coverage to extend to intentionally inflicted injuries so long as the insured exhibited one of the many mental illnesses included in R.C. 5122.01(A). The rule of liberal construction in favor of the insured does not require such a strained interpretation. *New Amsterdam Cas. Co. v. Johnson* (1914), 91 Ohio St. 155, 157–158, 110 N.E. 475, 475–476. We perceive no logical legal or medical rationale for applying this statute to the particular dispute before us. See, generally, *People v. Ramsey* (1985), 422 Mich. 500, 375 N.W.2d 297, 302.

In the context of insurance contracts, a wide variety of standards have been employed in attempts to define when an insured's otherwise intentional conduct becomes unintentional as a result of his mental incapacity. See, *e.g., Markland v. Clover Leaf Cas. Co.* (Mo.App.1919), 209 S.W. 602, 605 (insured "was not capable of distinguishing between right and wrong"); *Globe Am. Cas. Co. v. Lyons* (1981), 131 Ariz. 337, 340, 641 P.2d 251, 254 (insured "suffering from mental derangement which deprived her of her capacity to act in accordance with reason"); *West Am. Ins. Co. v. McGhee* (Ind.App.1989), 530 N.E.2d 110, 112 (insured "unable to conform his behavior to societal norms."). See, also, Annotation (1984), 33 A.L.R.4th 983, 988–1000. None of these guidelines appears to be particularly concrete.

Given that the conduct of the insured in such cases is usually—if not always—criminally proscribed, reference to Ohio's criminal provisions is the more sound approach. Accord *Aetna Cas. & Sur. Co. v. Sprague* (1987), 163 Mich.App. 650, 415 N.W.2d 230, 231; *Allstate Ins. Co. v. Miller* (1989), 175 Mich.App. 515, 438 N.W.2d 638, 642. The General Assembly has determined that a person is criminally responsible for his conduct and, hence, legally sane, unless "at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts." R.C. 2901.01(N). We are persuaded that an individual who is capable of forming the requisite criminal intent for purposes of prosecution must, *a fortiori*, be equally capable of forming the necessary "intent" to injure another within the ordinary meaning of an insurance contract. If a lesser standard were imposed in the insurance context, the perpetrator of a brutal assault could be found sufficiently sane to be amenable to severe criminal penalties while, simultaneously, sufficiently insane to fall within an "expected or intended injuries" exception of a standard policy. Absent clear language to the contrary, we will not interpret a contract for insurance to create such an anomalous situation.

Ironically, this would have been the probable result produced by the trial court—according to the expert testimony—had Gengler not committed suicide.

Dr. Wettstein was unable to deny that Gengler appreciated the wrongfulness of shooting his former girlfriend. He concluded simply that the assault was committed out of compulsion based upon "major depression" and "delusional jealousy." We hold that the mere existence of such a mental illness, not amounting to legal insanity as defined by R.C. 2901.01(N), does not establish that an insured was incapable of expecting or intending to inflict a bodily injury within the ordinary meaning of an insurance policy. Since Eberhart has not satisfactorily demonstrated Gengler's insanity, the applicability of the exclusion clause remains intact.

This assignment of error is also well taken.

### Assignments of Error Nos. III and IV

"III. The trial court erred in admitting the expert testimony of Dr. Wettstein as to Patrick Gengler's diminished capacity since it was unrelated to any insanity argument set forth by appellees in contravention of the Ohio Supreme Court's holding in *State v. Wilcox* [ (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523].

"IV. The trial court's acceptance of appellee's expert's opinion that Gengler was acting under a compulsion which he could not control is erroneous."

In resolving the first two assignments of error, we have assumed the expert testimony offered by Eberhart was duly admissible and entitled to full weight and authority. Consequently, resolution of these challenges one way or the other will not affect the ultimate result reached in this appeal. These assignments of error are therefore overruled.

### Conclusion

The judgment of the trial court is reversed, and the cause is remanded for entry by the trial court of a declaratory judgment consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BAIRD, P.J., and MAHONEY, J., concur.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.