[Cite as *State Farm Mut. Auto. Ins. Co. v. Schalk*, 2016-Ohio-732.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., et al. | : | |
| | : | |
| | : | C.A. CASE NO. 26573 |
| | : | |
| Plaintiff-Appellee | : | T.C. NO. 13CV3843 |
| | : | |
| v. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| MARVIN SCHALK, et al. | : | |
| | : | |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___26th___ day of __February___, 2016.

. . . . . . . . . .

NICHOLAS E. SUBASHI, Atty. Reg. No. 0033953 and ANNE P. KEETON, Atty. Reg. No. 0076811, The Greene Town Center, 50 Chestnut Street, Suite 230, Dayton, Ohio 45440
    Attorneys for Plaintiff-Appellee State Farm Mutual Automobile Insurance Co.

JONATHAN B. FREEMAN, Atty. Reg. No. 0067683 and STEVEN E. BACON, Atty. Reg. No. 059926, One South Main Street, Suite 1590, Dayton, Ohio 45402
    Attorneys for Defendant-Appellant Jerome L. Badders

SCOTT ELLIOT SMITH, Atty. Reg. No. 0003749, 5003 Horizons Drive, Suite 200, Columbus, Ohio 43220
    Attorney for Defendant-Appellant Tatyana Belenky

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tatyana Belenky and Jerome Badders appeal from a judgment of the

Montgomery County Court of Common Pleas, which granted State Farm Insurance

Company's motion for summary judgment in its action for a declaratory judgment related to insurance coverage. Specifically, State Farm had filed an action for a declaratory judgment that, under its insurance contract with Marvin Schalk,[1] it had no responsibility to provide liability coverage to or to defend or indemnify Schalk in any claim or suit arising from a December 2012 incident. Belenky and Badders were injured in the incident in question, and Badders was the owner of the business, the Courtyard Lounge. The trial court granted State Farm's motion for summary judgment on its claim for a declaratory judgment.

{¶ 2} For the following reasons, the judgment of the trial court will be reversed in part and affirmed in part.

### The Incident for which Insurance Coverage is in Dispute

{¶ 3} Schalk spent the late night and early morning hours of December 29-30, 2012 at the Courtyard Lounge, a bar he had frequented on and off for many years which was located in a strip mall in Englewood, Ohio. Schalk's estranged wife, Linda, was also at the bar. Schalk was upset about another man's suggestive comments to Linda that night, their estrangement, and other recent events in his life. He drank heavily and had not eaten for several hours.

{¶ 4} In the early morning hours of December 30, 2012, around the time of the bar's "last call," Schalk was asked to leave the Courtyard Lounge due to some inappropriate conduct toward Linda. At Linda's request, a mutual friend agreed to take Schalk home, but instead, the men drove in Schalk's truck, a Dodge Durango, to a house

---

[1]The insurance policy was issued to Marvin Schalk and his wife, Linda, but only Marvin's actions are at issue in this appeal. To simplify our discussion, we will refer to Marvin Schalk as "Schalk," and to his wife as "Linda."

just across the street from the Courtyard Lounge. The friend went into the house, and Schalk returned to the Courtyard parking lot about five minutes after he (Schalk) had left. By the time Schalk returned, the bar was closed, but some employees and patrons remained inside. Schalk knew that bar employees and patrons sometimes remained in the bar after closing, because he had stayed inside the bar after closing in the past. Schalk also observed several cars in the back parking lot upon his return. Linda was among the people who remained in the bar around 2:30 a.m., when Schalk returned. Badders, Badders's adult daughter, Belenky, and others were also present.

{¶ 5} Upon his return, Schalk first parked in the back parking lot of the bar, which was the side from which most patrons entered the bar. A few minutes later, he moved his truck to the front side of the bar. During this time, he also had a text message exchange with Linda, which reflected his desire to talk with her, an intention to "crash through the front door," and feelings that he needed to be "saved" and had "nothing to lose." Linda saw these messages and encouraged Schalk to go home; she believed that Schalk was outside her residence, rather than the bar, when the messages were sent.

{¶ 6} A short time later, Schalk drove his truck through the front window of the Courtyard Lounge and into the bar, injuring Belenky and Badders and causing extensive damage to the building.

{¶ 7} Schalk subsequently pled guilty to two counts of felonious assault (serious harm) and one count of vandalism (more than $7,500 but less than $150,000). He was sentenced to an aggregate term of four years in prison, was ordered to pay restitution totaling $3,834.94, and his driver's license was suspended for 9 years.

***Procedural History***

**{¶ 8}** In June 2013, State Farm, Schalk's insurance company, filed a complaint for declaratory judgment related to the potential claims of Badders, Belenky, the Courtyard Lounge, and others arising out of Schalk's driving his truck into the bar and the injuries and damages caused. Several other actions were filed related to the same incident; the parties moved to consolidate the cases, and the trial court granted the motion.

**{¶ 9}** Discovery was conducted over a period of several months and, in October 2013, State Farm filed a motion for summary judgment. The motion asserted that Schalk's act had been intentional, that it was not an "accident," and that it was, therefore, excluded from coverage under the policy. In January 2014, the trial court granted the motion for summary judgment.

### Summary Judgment & Declaratory Judgment Standards

**{¶ 10}** Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.,* 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler,* 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). Throughout, the

evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 11} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness,* 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. "*De novo* review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.,* 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co., Inc.,* 64 Ohio St.2d 116, 119-20, 413 N.E.2d 1187 (1980). Therefore, the trial court's decision is not granted deference by the reviewing appellate court. *Powell v. Rion,* 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.). *See also Jackson v. McKinney*, 2d Dist. Montgomery No. 26288, 2015-Ohio-1977, ¶ 11.

{¶ 12} There is some disagreement among the parties in this case as to the standard of proof required for a declaratory judgment. As with other civil actions, the plaintiff in a declaratory judgment action must prove at trial each allegation in the complaint by a preponderance of the evidence. *Estate of Severt v. Wood*, 107 Ohio App.3d 123, 129, 667 N.E.2d 1250 (2d Dist.1995). However, when a party files a motion for summary judgment in a declaratory judgment action, the more stringent summary judgment standard applies.

### *Intent to Cause Injury*

{¶ 13} Badders and Belenky filed separate briefs in this appeal and framed their assignments of error slightly differently, but the cruxes of their arguments are the same. Both contend that the trial court erred in concluding that 1) because Schalk's act of driving his vehicle into the bar was done intentionally, their injuries did not result from an

"accident," and 2) Schalk's intent to cause injury to them was "intrinsically tied" to his intentional act of driving his truck into the bar, and therefore that Schalk's intent to cause injury is inferred as a matter of law.

{¶ 14}   Under the "LIABILITY COVERAGE" section and the "Insuring Agreement" heading, the State Farm policy states, in pertinent part:

> *We* will pay damages an *insured* becomes legally liable to pay because of:
>
> a.  *bodily injury* to others; and
>
> b.   damage to property caused by an accident that involves a vehicle for which that *insured* is provided Liability Coverage by this policy. (Emphasis sic.)

The term "accident" is not defined in the policy.

{¶ 15}   In the same section, under the "Exclusions" heading, the policy states:

> THERE IS NO COVERAGE FOR AN *INSURED*:
>
> 1.   WHO INTENTIONALLY CAUSES *BODILY INJURY* OR DAMAGE TO PROPERTY.   (Emphasis and capitalization sic.)

A careful examination of this policy language reveals that the policy requires payment for bodily injury to others if the insured becomes liable; only the liability to pay for damage to property is conditioned on the damage being caused by an accident.   The exclusion for intentional acts apples to both bodily injury and property damages.

{¶ 16}   State Farm framed its argument in support of summary judgment (and in its brief) in terms of two separate questions: 1) whether an "accident" occurred that triggered coverage under the policy, and 2) if there were an "accident," whether an exclusion applies because the act was intentional.   Based on the Ohio Supreme Court

case law on this issue, however, we conclude that there is really only one issue: whether, as a matter of law, Schalk intended to cause injury.

{¶ 17} State Farm argues that the term "accident," as used in the policy, must be given its plain and ordinary meaning, because the term is not defined in the policy. It cites several definitions which focus on the unexpected, unintended, and/or unforeseeable nature of an "accident." State Farm contends that the incident at Courtyard Lounge was not an accident, because it was intended and the injuries were foreseeable.

{¶ 18} In *Safeco Ins. Co. of Am. v. White*, 122 Ohio St.3d 562, 567, 2009-Ohio-3718, 913 N.E.2d 426, the Supreme Court discussed the definition of an "accident" in the context of insurance coverage. The policies in that case defined an "occurrence" under the policy as an "accident" that resulted in injury or property damage. The Supreme Court recognized that, in its common, ordinary use, something "accidental" is not intended or intentional in nature. *Id.* at ¶ 21. The Court also recognized, however, that the term "accident," as the term is ordinarily used, "is a more comprehensive term than 'negligence.' " *Id.*, citing *Rothman v. Metro. Cas. Ins. Co.,* 134 Ohio St. 241, 247, 16 N.E.2d 417 (1938).[2] In fact, in *Rothman*, the court held that wanton misconduct falls within the definition of an "accident" in an insurance policy; "absent contrary language in

---

[2]In *Kish v. Central Nat. Ins. Group of Omaha*, 67 Ohio St.2d 41, 48, 424 N.E.2d 288 (1981), the Supreme Court limited the analysis employed in *Rothman* to circumstances in which recovery is sought under a liability insurance policy that has the purpose of indemnifying the insured against liability arising from the insured's own (or his agent's or relative's) tortious conduct. *Kish* recognized that *Rothman* only spoke "to the perspective that governs the determination of whether an event is an accident for purposes of indemnity policies," and it "disaffirmed" the *Rothman* analysis as applied to certain other types of coverage, such as uninsured motorist coverage, where the "intent" of the insured does not have the same role in coverage determinations.

a policy, 'if the injury was not intentionally caused, then it was accidentally suffered.' " *Id.* at ¶ 21, citing *Rothman* at 246.

**{¶ 19}** *White* and *Rothman* hold that an act that causes injury is an "accident" under an insurance policy (unless more narrowly defined in the policy) if the act is negligent, reckless, or wanton, even if the injury was foreseeable or could be expected. Only if the injury was *intended* is coverage precluded on the basis that the incident was not an "accident." As such, State Farm's argument that the incident was not an accident is subsumed in its argument that an exclusion applied because the injuries were intentionally inflicted. An intent to injure is central to each determination.

**{¶ 20}** Like Schalk's policy, many insurance policies contain an intentional-act exclusion, which states that the insurance company will not be liable for harm intentionally caused by the insured. When there is no direct evidence of an intent by the insured to cause injury, the insured's intent may, in certain limited instances, be inferred as a matter of law. *Allstate Ins. Co. v. Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090, ¶ 9, citing *Gearing v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 665 N.E.2d 1115 (1996), paragraph one of the syllabus. "The 'more likely harm is to result from certain intentional conduct, the more likely intent to harm may be inferred as a matter of law.' " *Allstate Ins. Co. v. Campbell*, 10th Dist. Franklin Nos. 09AP-306, 09AP-307, 09AP-308, 09AP-309, 09AP-318, 09AP-319, 09AP-320, 09AP-321, 2009-Ohio-6055, ¶ 47, affirmed on appeal in relevant part by *Campbell*, 128 Ohio St.3d 186. For such a determination to be made on summary judgment, there must be no genuine issues of material fact as to the insured's intent, with all inferences being construed in favor of the non-moving party.

**{¶ 21}** The Supreme Court has held that, with respect to certain acts such as sexual molestation of a child or murder, the intent to injure may be inferred as a matter of law, because the harm is "intrinsically tied" to the act committed by the insured. *Gearing; Preferred Risk Ins. Co. v. Gill*, 30 Ohio St.3d 108, 507 N.E.2d 1118 (1987). *See also Auto-Owners Ins. Co. v. Brubaker*, 93 Ohio App.3d 211, 638 N.E.2d 124 (6th Dist.1994) (finding inferred intent to cause psychological harm where a 52-year-old engaged in a sexual relationship with a minor); *W. Reserve Mut. Cas. Co. v. Macaluso*, 91 Ohio App.3d 93, 631 N.E.2d 1079 (9th Dist.1993) (inferring intent to injure when "excellent marksman" shot from ten feet away a person entering his home); *Westfield Ins. Co. v. Roberts*, 88 Ohio App.3d 532, 624 N.E.2d 343 (11th Dist.1993) ("the intent to molest [a minor] and the intent to harm cannot be divorced from one another"); *W. Reserve Mut. Cas. Co. v. Eberhart,* 81 Ohio App.3d 93, 610 N.E.2d 481 (9th Dist.1991) (holding that injuries resulting from shooting girlfriend "at point-blank range" were intended).

**{¶ 22}** Similarly, in cases involving the intentional setting of a fire, courts have held that intent to damage property was inherent in the act of setting the fire such that there could be no question, as a matter of law, whether the intent to cause property damage existed. *See, e.g., Royal Paper Stock Co. v. Robinson*, 10th Dist. Franklin No. 12AP-455, 2013-Ohio-1206, and *Lachman v. Farmers Ins. of Columbus*, 8th Dist. Cuyahoga No. 96904, 2012-Ohio-85 (holding that intentional act exclusions applied to claims for fire damage where the fire was intentionally set, although the scope of the property damage was not intended).

**{¶ 23}** In many cases, whether the harm suffered was "intrinsically tied" to the intentional act is difficult to ascertain and is fact-sensitive. Courts confronting this issue

must examine whether the act necessarily resulted in the injury, rather than whether it was foreseeable or substantially certain that the act would cause an injury. *Campbell,* 128 Ohio St.3d 186 at ¶ 56. Intent may be inferred as a matter of law only in cases in which the insured's intentional act is "intrinsically tied" to the injury it caused. Limiting the scope of the doctrine of inferred intent is appropriate because the rule is needed only in a narrow range of cases: those in which the insured's testimony on harmful intent is irrelevant because the intentional act could not have been done without causing harm. *Id.* at ¶ 48. "For example, intent could hypothetically be inferred in certain felonious-assault or rape cases, where the intentional acts necessarily cause harm; however, courts should be careful to avoid applying the doctrine in cases where the insured's intentional act will not necessarily result in the harm caused by that act." *Id.*

**{¶ 24}** Almost any injury that one causes while driving under the influence of drugs or alcohol is foreseeable and arguably even substantially certain to occur. But an intent to cause those injuries is not generally inferred in such a situation, because more than foreseeability or substantial certainty is required to infer an intent to cause injury. *Campbell* at ¶ 56. The opposite of "intentional" is not "accidental"; even recklessness and wantonness, which are mens rea short of intent and which can encompass the irresponsibility and likelihood of injury inherent in Schalk's conduct, fall short of "intent" to cause injury. *See Campbell* at ¶ 56.

**{¶ 25}** The parties discuss numerous cases in which courts have addressed the question of inferred intent to cause injury.

**{¶ 26}** In *Campbell,* several teenaged boys placed a Styrofoam deer (a type to be used for target practice) just below a crest in a hill on a hilly, curvy, 2-lane highway with

a 55 mile-per-hour speed limit after dark. The boys then observed the reaction times of motorists. After at least two cars had successfully maneuvered around the Styrofoam deer, a motorist lost control of his vehicle while taking evasive action, resulting in injury to the driver and his passenger. The Supreme Court held that it could not say, "as a matter of law that the act of placing a target deer in a road in the manner done here necessarily results in harm." *Id.* at ¶ 51. The appellate court's opinion noted that other cars had passed by and avoided the target, as the boys expected, and that the boys, knowing that the deer was Styrofoam, never contemplated the possibility of serious harm resulting from their "prank." *Campbell*, 10th Dist. Franklin Nos. 09AP-306, 09AP-307, 09AP-308, 09AP-309, 09AP-318, 09AP-319, 09AP-320, 09AP-321, 2009-Ohio-6055, ¶ 51-52. "While the boys' act was ill-conceived and irresponsible and resulted in serious injuries, the action and the harm are not intrinsically tied the way they are in murder and sexual molestation." Thus, the court held that the doctrine of inferred intent was inapplicable. *Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, at ¶ 51.

{¶ 27} In *Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906 (1991), two groups of teenagers had a minor altercation near a lake where they had been swimming. Afterward, one of the groups remained at the lake while the other dispersed. One of the boys in the latter group retrieved a BB gun from his home and returned with some friends to the lake, where the other group was still gathered around a picnic table. Upset over the previous encounter, the boy stood behind a shed about 70-100 feet from the rival group, aimed the BB gun in the direction of the group, and shot three times, injuring a boy who was struck in the eye. According to the shooter's testimony, he was aiming at a sign on a tree about 10-15 feet from the picnic table, and

his purpose in shooting at the sign was to scare the members of the rival group. The shooter testified that he did not believe he would hit any of the teens at the picnic table.

{¶ 28} The trial court found that the injury was accidental, although the shooting itself was intentional, and that the insurance policy exclusion for "expected or intended" injuries did not apply. The appellate court reversed the trial court's judgment, but the Supreme Court agreed with the trial court that the injury itself was neither intended nor substantially certain to occur, that the injury was accidental, and that the exclusion did not apply.

{¶ 29} In *State Farm Mut. Ins. Co. v. Gourley*, 10th Dist. Franklin No. 12AP-200, 2012-Ohio-4909, the insured drove her car along a road behind a separate vehicle in which her boyfriend and another woman were driving. In a jealous rage, the insured woman intentionally and repeatedly struck the boyfriend's vehicle with her car while traveling at a high rate of speed. "[The insured] followed [her boyfriend's car] down a congested, two-lane roadway, accelerated to keep up with him, and intentionally rammed her car into the rear of his vehicle." *Id.* at ¶ 29. After the second collision, the boyfriend's car spun into the lane of oncoming traffic and was hit by a third car. The woman in the boyfriend's car and two occupants of the third vehicle were injured. The trial court concluded that the insured's intentional act of hitting her boyfriend's car with another vehicle was intrinsically tied to the injury to the woman traveling with the boyfriend; it inferred intent as a matter of law as to this victim. The trial court did not grant summary judgment on the question of whether the injuries to the occupants of the third car had been intended, and State Farm's claim for a declaratory judgment with respect to these claims was subsequently dismissed. The appellate court affirmed the

trial court's holding regarding the woman in the boyfriend's car.

{¶ 30} A case from this district, *Moler v. Beach*, 102 Ohio App.3d 332, 657 N.E.2d 303 (2d Dist.1995), concerned a longstanding dispute between neighbors about a common boundary line, which devolved into rock throwing. The trial court found that Beach (the insured) had intentionally thrown a rock in the direction of Moler, that the rock hit Moler on the foot, and that it caused an injury; however, the trial court declined to infer an intent to injure. On appeal, we agreed with the trial court's analysis. "The intentional act of directing a rock towards a victim is a far cry from shooting a victim at point blank range. The intention of the rock hurler may simply be to slam the rock into the ground in front of the victim (possibly the situation here since the victim was hit in the foot) or simply toss it short of the victim as a warning or insult of some kind. In any case, we find that the trial court was well within its discretion in not stretching the presumption of intent to the facts of this case * * *." *Id.* at 338.

{¶ 31} On the date of oral arguments in this case, the Supreme Court released an additional case discussing inferred intent, *Granger v. Auto-Owners Ins.*, 144 Ohio St.3d 57, 2015-Ohio-3279, 40 N.E.3d 1110. *Granger* addresses whether an intent to cause personal injury, humiliation, can be inferred, as a matter of law, from a landlord's discriminatory acts in renting a property, thus triggering the intentional acts exclusions of an insurance policy. The Court said "the appropriate question to ask is whether [the person who intentionally discriminated] expected or intended [the person who was discriminated against] to be humiliated by his conduct." (Internal citations omitted). *Id.* at ¶ 36. While acknowledging that the doctrine of inferred intent is not limited to sexual molestation or homicide, the Supreme Court again advised courts to be "careful to avoid

applying the doctrine of inferred intent where the insured's act will not necessarily result in the harm caused by the act." (Internal citations omitted). *Id.* at ¶ 40. Thus, *Granger* held that it could "not find that humiliation is so intrinsically tied to pre-lease discrimination that [the insured's] act necessarily resulted in the harm suffered by the [complainant]." *Id.* at ¶ 37. The evidence of intent was not inherent in the insured's act, *id.* at ¶ 33, and thus the policy did not, as a matter of law, exclude coverage.

**{¶ 32}** These cases demonstrate that an intent to injure will be inferred, as a matter of law, only in a very narrow group of cases in which injury was inherent in the intentional act. With this standard in mind, we turn to the facts of Schalk's case.

**{¶ 33}** Schalk's wife, Linda, stated that she had been concerned about Schalk's mental state in the months before the incident at the Courtyard Lounge due to the death of his father and other issues, and that she had taken his guns away from him a few months earlier for fear that he would hurt himself. Linda and Schalk had the following text message exchange immediately before Schalk drove into the building. He apparently was trying to convince her to talk with him.

> Sent by Schalk:  "uhhh one mo time"
>
> "Gonna crash through the front door swear to god."
>
> "Gonna give u 5 from noe [now]"
>
> "Pls don't make me"
>
> "If you ever loved me save me"
>
> "Trust me nothing to lose"
>
> Sent by Linda:  "Go home plz"
>
> Sent by Schalk  "ok its time tell kids I luv them."

Linda stated in her deposition that she had believed Schalk was at her home, not outside the bar, when he sent these texts.

{¶ 34} Linda characterized Schalk as "troubled" and "not in his right mind," but she did not believe that he had intended to hurt her or anyone else. Linda also testified that the lights had been off on the side of the bar where Schalk's truck entered, and she did not think that he would have been able to see inside from his truck. She testified in her deposition that people were generally not over on the side of the building where Schalk entered in his vehicle.

{¶ 35} The crash report prepared by the police indicated that Schalk's vehicle had crossed an outdoor fence and picnic area before crashing through the window and hitting chairs and tables inside the bar. The report estimated that the truck had been travelling at approximately 43 miles per hour when it hit the building. The bar was small, approximately 1,000 square feet, and Schalk's truck crossed the entire bar before stopping when it was about four feet through the opposite exterior wall from where it had entered.

{¶ 36} Schalk stated in his deposition that, on the night in question, he was depressed, overworked, and frustrated. He was also upset that the owners of the bar were not as friendly to a musician friend he had brought to the bar as he (Schalk) thought they ought to have been. He drank "a little bit of everything" from the time he arrived at the bar around 9:30 or 10:00 p.m. through the time of the crash, and he did not eat anything during this time. He felt that a man who was trying to hit on Linda and had done so in the past was trying to aggravate him (Schalk) by making comments to Linda of a sexual nature within earshot of Schalk. He recalled that he had not felt violent, but rather

empty and lonely. He felt like "crashing through the bar" to hurt himself, but it "had nothing to do with anybody else." He denied having any grudge against the bar. He had engaged in other reckless behaviors in the months prior to this incident, including shooting a gun at a tree and driving his truck very fast, without regard for the potential consequences.

{¶ 37} Schalk estimated that, when he returned to the bar and parked in the back, 5-10 other cars remained at the bar. He began to text with Linda, trying to get her to come out of the bar and talk with him. They texted for about 20 minutes, beginning around 2:30 a.m. She told him to go home (still not realizing he was outside the bar, not her residence). Schalk worried about how he would be perceived by Linda if he did not follow through on his threat to "crash through the front door."

{¶ 38} Schalk testified that, when his truck was parked in the front of the bar, he thought he could see clearly into the bar, and he had believed that no one was in the way of his vehicle. The truck stopped in the women's restroom, and Schalk acknowledged that, if anyone had been in the restroom, she probably would have been killed. Schalk thought he was "taking a path that would not hit anybody," to the left of the bar and to the right of the stage where the band was packing up. He testified that a "straight angle" through the bar from the front parking lot would have been "a path of most destruction" straight at the bar. He also stated that he did not remember hitting the gas pedal or how hard he had pressed it.

{¶ 39} Based on the evidence presented in this case, the trial court erred in concluding, as a matter of law, that there were no genuine issues of material fact as to whether Schalk "intentionally caused bodily injury" to patrons of the bar and that his

actions were so "intrinsically tied" to the injuries as to infer such an intent. Although injuries were certainly foreseeable, foreseeability is insufficient to infer an intent to injure, because foreseeability of an injury is often present when an act is merely reckless or wanton (i.e., something less than intentional). Foreseeability or substantial certainty of injury does not "intrinsically tie" an injury to an intentional act. *See Campbell* at ¶ 52-56.

{¶ 40} The Supreme Court has made it clear that it is not sufficient that bodily injury be a foreseeable or even substantially certain result of the intentional act of the insured. Rather, the bodily injury must necessarily result from the intentional act; that is, the injury cannot be divorced from the intentional act. As with any dictionary definition of "intrinsic," the bodily injury must be an essential part of the intentional act by the very nature of the intentional act.

{¶ 41} If an insured intentionally sets a fire, property damage necessarily occurs – that's what fire does, it causes property damage. If someone sexually molests a child, injury necessarily occurs, that is the essential nature of sexual molestation.

{¶ 42} But if an insured puts a decoy in the middle of a curvy road or shoots a BB gun at a crowd or drives a truck into a building, bodily injury does not necessarily result; those intentional acts could occur without resultant bodily injury. Add to that the undisputed testimony that the driver was trying to miss occupied parts of the building, that he did not want to injure anyone except himself, that other people in the building were not injured, an intent to cause others bodily injury cannot be inferred as a matter of law.

{¶ 43} The trial court emphasized in its judgment that Schalk caused great damage to the bar and "his truck did not stop until it hit a cinder block wall at the back of the Courtyard" in concluding that the injuries he caused were foreseeable. The court

also relied on *State Farm Mut. Ins. Co. v. Hayhurst*, 4th Dist. Pickaway No. 99 CA 25, 2000 WL 715000 (May 31, 2000), a case involving property damage (but no injuries) in which an insured ran into several buildings within an apartment complex in his car while feeling depressed. We agree with the holding in *Hayhurst* that the property damage caused in that case was intrinsically tied to the intentional act, and thus excluded from coverage, and we find similarly with the facts before us. *Accord Lachman*, 2012-Ohio-85. However, property damage does not necessarily result in bodily injury, and the question of intent to cause bodily injury is distinct.

{¶ 44} We do not reach the question of whether Schalk did or did not intend bodily injury; we only conclude that there is a genuine issue of material fact which precludes the resolution of this question as a matter of law. It is for a jury to determine whether Schalk's actions were akin to shooting at someone from 100 feet away, as in *Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906, or to a shooting at point-blank range, as in *Eberhart*, 81 Ohio App.3d 93, 610 N.E.2d 481. The trial court erred in concluding, as a matter of law, that the scope of the damage permitted the inference of an intent to cause bodily injury.

{¶ 45} Belenky's and Badders' assignments of error are sustained.

{¶ 46} The judgment of the trial court regarding the exclusion of coverage for bodily injury will be reversed, and the matter will be remanded to the trial court. The summary judgment on State Farm's claim for declaratory judgment on any claims for property damage arising from this incident is affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurring:

{¶ 47} I concur with the lead opinion, as I believe that while Schalk's conduct was

substantially certain to cause bodily injury to others, substantial certainty is not the applicable standard for determining whether it is appropriate to apply the doctrine of inferred intent. Rather, the Supreme Court of Ohio has provided that the standard is very limited in scope and that the doctrine applies only in circumstances where "the intentional act could not have been done without causing the harm." *Allstate Ins. Co. v. Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090, ¶ 48. The Supreme Court has warned that courts should "avoid applying the doctrine in cases where the insured's intentional act will not necessarily result in the harm caused by that act." *Id.*

{¶ 48} Under the specific circumstances of this case, there was a possibility, however remote, that Schalk could have crashed his truck into the Courtyard Lounge without causing bodily harm to any of the occupants inside. The tavern was not heavily occupied at the time of the crash, and there were occupants in the tavern who were not injured during the incident. Had Badders and Belenky been positioned differently, perhaps they would not have been injured either. Therefore, I cannot conclude that Schalk's act of crashing his truck into the tavern automatically results in bodily harm to others. Property damage, yes; bodily harm, no. Accordingly, it was inappropriate for the trial court to apply the doctrine of inferred intent as opposed to letting the jury decide whether Schalk had the requisite intent to cause bodily harm.

{¶ 49} That being said, I write separately on this matter to address the Tenth District's decision in *State Farm Mut. Ins. Co. v. Gourley*, 10th Dist. Franklin No. 12AP-200, 2012-Ohio-4909, which is cited in both the lead and dissenting opinions. In *Gourley*, the Tenth District applied the doctrine of inferred intent to a situation where the defendant, a jealous girlfriend, intentionally rear-ended another vehicle containing her

boyfriend and his paramour at high rate of speed on a congested two-lane roadway.   The defendant testified that she did not intend to injure anyone, but that she was aware that striking a vehicle in such a manner *could* cause it to go left of center into oncoming traffic. *Id.* at ¶ 18, 24, and 29.   As a result of the defendant's conduct, her boyfriend indeed lost control of his vehicle, crossed into oncoming traffic, and collided with an oncoming vehicle, which caused bodily injury to the defendant, the paramour, and the occupants of the oncoming vehicle.   *Id.* at ¶ 3.   The Tenth District held that the bodily injury to the paramour was intrinsically tied to the defendant's intentional act of rear-ending the boyfriend's vehicle, stating that the injuries necessarily resulted from the intentional act. *Id.* at ¶ 29-30.

**{¶ 50}** In my opinion, the inferred intent analysis used in *Gourley* is more akin to the "substantially certain" test that was specifically rejected by the Supreme Court in *Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090 at ¶ 56.   This is because the Tenth District inferred intent to commit bodily harm even though it can be argued that intentionally rear-ending another vehicle in the manner described in *Gourley* will not necessarily result in bodily harm, as bodily harm does not automatically flow from rear-ending a vehicle.   Although it is substantially certain or foreseeable that some form of bodily harm could occur as a result, that is insufficient to infer intent to cause bodily harm.   Therefore, in my opinion, the Tenth District incorrectly applied the doctrine of inferred intent in *Gourley*.   Accordingly, I would not rely on *Gourley* in the analysis of the present case.

**{¶ 51}** It is also worth mentioning that Schalk's guilty plea to two counts of felonious assault does not permit a finding of intent to commit bodily harm either.   In pleading guilty

to felonious assault under R.C. 2903.11(A)(1), Schalk admitted to knowingly causing serious physical harm to Badders and Belenky. Multiple courts have held that "the mental state of 'knowingly' is sufficient to establish an intent to injure and trigger an intentional acts exclusion, *as long as the exclusion is not restricted only to intentional, acts, but also includes the expected results of one's acts.*" (Emphasis added.) *Baker v. White*, 12th Dist. Clermont No. CA2002-08-065, 2003-Ohio-1614, ¶ 10; *Cummings v. Lyles*, 2015-Ohio-316, 27 N.E.3d 985, ¶ 15 (8th Dist.); *Drake v. Richardson*, N.D. Ohio No. 5:11CV1898, 2012 WL 2681413, * 5 (July 6, 2012). In this case, the insurance policy provision at issue excludes only intentional acts. Had the policy also included language excluding the "expected results of one's acts," Schalk's guilty plea to felonious assault would have permitted a finding of intent to cause bodily harm. However, that is not the case here.

{¶ 52} Therefore, I concur with the lead opinion, concluding that the trial court erred in granting State Farm's Motion for Summary judgment.

. . . . . . . . . .

HALL, J., dissenting:

{¶ 53} Schalk, a highly intoxicated (BAC .255) driver, warned that he was "gonna crash through the front door" of an occupied tavern. Within minutes, he drove his two-ton pickup truck into and through the bar, at an estimated speed of 43 MPH, crashing through a plate-glass window, destroying tables and chairs, smashing down a women's restroom wall, and knocking through the rear block wall, seriously injuring two people. Stuck in the rear wall, he then shifted the vehicle into four-wheel drive to try to drive out. This event was not an "accident," and his activity "intentionally cause[d] bodily injury or damage to

property." I would affirm the trial court's grant of summary judgment to State Farm, which had the policy of insurance covering the driver, Marvin Schalk, for injury or damage only if it was "caused by an accident," and excluding coverage for one "who intentionally causes bodily injury or damage to property."

{¶ 54} The majority cites *Safeco Ins. Co. of Am. v. White* and *Rothman v. Metro Cas. Ins. Co.,* both of which deal with the definition of the term "accident" in insurance policies, for the proposition that when an injury was not intentionally caused the event would be included under the term "accident" and allow coverage under a policy that applies only to an accident. The lead opinion concludes from those cases that if the only events that are excluded from the term accident are those where the injury is intentionally caused, then the analysis of whether an event is an accident is the same as determining whether the injury is excluded from coverage by an intentional-acts exclusion. Although whether an event is an accident is related to the issue of whether an intentional-act exclusion applies, I view the questions as separate and distinct concepts that should be analyzed separately, particularly when a policy  states that it only covers accidents but does not have a corresponding intentional-acts exclusion (as does the policy in *Gourley, infra*).

{¶ 55} I do not believe that either *Safeco* or *Rothman* directly applies here. *Safeco* involved homeowner's coverage for the Whites, parents of a 17-year-old boy who repeatedly had stabbed a 13-year-old neighbor. The victim and her parents brought intentional-tort actions against the 17-year-old and negligent-supervision and negligent infliction of emotional distress claims against the boy's parents. The *Safeco* court held "the negligent acts of the Whites are 'occurrences' under the language of the Safeco

policies at issue." *Safeco* at ¶ 4. The applicable policy language stated that an "'occurrence' means an accident." *Id.* ¶ 15. But the claims against the Whites were for their negligence for failing to supervise their minor child. As to them, the stabbing was a fortuitous event, not intended or expected. Coverage was applicable for the Whites on the negligence claims, not for the son for his intentional torts. The *Safeco* factual scenario is therefore markedly different than here where the insured, Marvin Schalk, is the one who intentionally crashed through the building.

{¶ 56} I recognize that property damage in a faulty-construction context involves a different analysis, but in the construction-insurance context, the Ohio Supreme Court has recognized:

> We have defined "accidental" as "unexpected, as well as unintended." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 666, 597 N.E.2d 1096 (1992). In defining the ordinary meaning of "accident" in the context of a CGL policy that, too, did not include a definition of the word, our sister court in Kentucky held, "Inherent in the plain meaning of 'accident' is the doctrine of fortuity. Indeed, '[t]he fortuity principle is central to the notion of what constitutes insurance * * *.' " *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 74 (Ky.2010), quoting Corpus Juris Secundum, Insurance, Section 1235 (2009).

*Westfield Ins. Co. v. Custom Agri Sys., Inc.,* 133 Ohio St. 3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 13. Applying the concept of fortuity here, there is nothing fortuitous to Schalk about his crashing through an occupied building that results in injury.

{¶ 57} In *Rothman*, decided in 1938, Esther Rothman was a passenger in a car

driven by Mr. Malkin, who had taken her to Cleveland to purchase rugs and furniture. At that time, the Ohio guest statute, G.C. 6308-6, prohibited recovery for a non-paying passenger's injury "unless such injuries or death are caused by the wilful or wanton misconduct of such operator." Consequently, Esther could only pursue a claim, and she had received a verdict and judgment, on the basis that her injuries resulted from "wanton misconduct." The insurance-coverage question before the Supreme Court was whether Esther's injuries, attributed to "wanton misconduct," were a loss "in consequence of an accident." The holding in *Rothman*, contrary to what the case often may have been cited for, is that injury resulting from "wanton misconduct" was included in the term "accident," not that indisputably intentional misconduct that results in injury is not an accident.[3]

{¶ 58} In my view, whether the event in this case was an "accident" is legally identical to *State Farm Mut. Ins. Co. v. Gourley*, 10th Dist. Franklin No. 12AP-200, 2012-Ohio-4909. There, Rebecca Gourley followed a car driven by her boyfriend, Davidson, that contained his new girlfriend. Gourley intentionally rammed the boyfriend's car from behind at least twice, resulting in his car spinning out of control into oncoming traffic and causing injuries to the boyfriend, new girlfriend, and occupants of the oncoming car. Gourley pled no contest and was convicted of felonious assault. Her insurer, State Farm, provided coverage for injury or damage "caused by accident." The policy *did not* have an

---

[3]I note that *Rothman* has been partially abrogated by *Kish v. Central Nat. Ins. Group of Omaha*, 67 Ohio St. 2d 41, 424 N.E.2d 288 (1981), in which the Ohio Supreme Court, *for purposes of uninsured-motorists coverage*, determined that whether an injury is caused by an "accident" should be analyzed from the viewpoint of the victim (the one who has insurance with uninsured coverage), not from the viewpoint of an intentional tortfeasor. Whether this means injured occupants of the bar may have been victims of an "accident" for purposes of their own uninsured policies is not before us.

intential-acts exclusion, so the lack-of-coverage holding of the case necessarily is limited to whether the event was an "accident."

{¶ 59} As did Schalk, Gourley insisted she did not intend to hurt anyone. She also said that she blacked out before she hit the boyfriend's car a second time, thereby again denying intent to injure. The Tenth District noted that "Gourley's self-serving statement carries little weight when presented in opposition to summary judgment." *Gourley* at ¶ 25. " 'Because it is always in the interest of an insured to establish coverage and avoid policy exclusions, an insured's self-serving statements denying intent to injure are often "of negligible value in demonstrating intent or expectation." ' " *Nationwide Mut. Ins. Co. v. Layfield*, 11th Dist. Lake No. 2002-L-155, 2003-Ohio-6756, ¶ 12 (internal citations omitted). That is consistent with the Tenth District's observation that "a non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence." *White v. Sears, Roebuck & Co.*, 10th Dist. Franklin No. 10AP-294, 2011-Ohio-204, ¶ 9. I believe that concept should apply here.

{¶ 60} In my view, Schalk's own uncorroborated professed lack of intent to injure— a claim that flies in the face of the indisputable nature of driving through an occupied bar—should be discounted. To hold otherwise would afford insurance coverage to the unwise, the prevaricators, and the drunks, yet deny coverage to the reasonable, the truthful, and the sober. Any reasonable person would realize driving through a small occupied bar will result in injury to its occupants. Only a dolt would not be able to realize that result. That would leave the reasonable without coverage, but the dolt would be insured. Likewise, giving full credence to one who would be willing to submit an

uncorroborated affidavit denying intent to injure, when the objective nature of the intentional event demonstrates otherwise, would allow coverage to the prevaricator but deny it to the truthful. Following the same logic, a drunk (BAC .255) whose voluntary intoxication prevents him from recognizing the ordinary and inevitable consequences of his intentional acts could be insured, while the sober actor would be unprotected. Accordingly, Schalk's uncorroborated subjective self-serving protestations are insufficient to objectively create a genuine issue of material fact.

{¶ 61} The *Gourley* court eventually concluded:

Under the facts of this case, we agree with the trial court that no reasonable person could conclude that Gourley could have reasonably expected anything other than what eventually transpired from the moment she accelerated to catch up with Davidson and intentionally struck his vehicle from behind. Certainly Gourley was aware of the possibility that her striking Davidson's vehicle from behind was dangerous and could result in him losing control of his vehicle. Indeed, Gourley testified that she understood that striking a vehicle from behind could result in that vehicle traveling left of center. Even if Gourley did not strictly intend the second collision [with the boyfriend's car], her initial, intended collision with Davidson commenced the chain of events that led to the second collision. Because the collision with [the third] car was the result of intentional acts that led to Davidson losing control of his vehicle and crossing into oncoming traffic, the injuries to Jacobs, Davidson's passenger, were not unintended, unforeseen or

unexpected. Accordingly, Gourley's actions were not an "accident" within the meaning of the State Farm policy.

*Gourley* at ¶ 24.[4]

{¶ 62} The same result should apply to Schalk. He said he was going to crash into the bar. He knew people were inside. He drove through, injuring occupants. It was no accident. Finally, I have been unable to find a case supporting the notion that we should parse the property damage to the building and contents from the inevitable injury to its occupants. No one reasonably could contend that driving through the bar and causing extensive property damage was an "accident." It was not fortuitous. The nature of that event cannot somehow change into an accident in the middle of the bar when known occupants of the bar are injured. Accordingly, on the first issue alone of whether this was a covered "accident," I would affirm the grant of summary judgment denying coverage to Schalk.

{¶ 63} Similarly, I conclude that insurance coverage for the bar-crashing event should be denied under the intentional-acts exclusion. This determination depends upon whether the doctrine of inferred-intent applies. I agree that the most recent Supreme Court opinion addressing how we should analyze that inferred intent is *Allstate Ins. Co. v. Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090. There, the lead opinion, clouded with multiple partial concurrences and dissents, encapsulates the

---

[4]The trial court had denied summary judgment to State Farm with regard to coverage for injuries to the driver of the third car, but that claim had been dismissed before entry of the final judgment that was appealed. Though *Gourley* did not deal with the injuries and damage related to the third car, the quoted language from the decision is broad enough to conclude that summary judgment would have been appropriate to deny coverage to Gourley for injuries and damage related to the third car.

holding:

> It is clear that as applied to an insurance policy's intentional-act exclusion, the doctrine of inferred intent applies only in cases in which the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm. Limiting the scope of the doctrine is appropriate because the rule is needed only in a narrow range of cases— those in which the insured's testimony on harmful intent is irrelevant because the intentional act could not have been done without causing harm. Thus, an insured's intent to cause injury or damage may be inferred only when that harm is intrinsically tied to the act of the insured—i.e., the action necessitates the harm.

*Id* at ¶ 48.

**{¶ 64}** Application of *Campbell* here means, first, that Schalk's own testimony about his lack of intent to injure is "irrelevant." That is because the nature of inferred intent is that intent is inferred from the undisputed circumstances of the event, not from the actor's stated intentions. Therefore, reliance on Schalk's testimony referenced in the majority opinion—that he tried to thread his way through the bar so as not to hit persons (that he could not see)—is misplaced. The singular question in this regard is whether the harm is "intrinsically tied to the act of the insured—i.e., the action necessitates the harm." I believe the harm, which includes both the property damage and injuries, is intrinsically tied to Schalk's action and that action does necessitate the harm. The photographs attached to Schalk's deposition demonstrate the extent of the interior conflagration. The diagram from the traffic crash report (Schalk depo. at Exh. 1) demonstrates an undeniably

intentional act. The description of the event that begins this dissent is one that necessitates the harm. I agree with the trial court's observation that "[i]t is unfathomable to this Court how the property damage and the injuries incurred by [the two injured parties] are not intrinsically tied to Schalk's intentional act." (Decision, etc., 1-9-2015 at 10). I would affirm the summary judgment decision denying coverage on Schalk's policy of insurance.

. . . . . . . . . . . . .

Copies mailed to:

Nicholas E. Subashi
Anne P. Keeton
Jonathan B. Freeman
Steven E. Bacon
Scott Elliot Smith
Hon. Barbara P. Gorman